**STATE, Plaintiff, v LERNER, Defendant.**

Common Pleas Court, Hamilton County.

No. 57048.    Decided June 9, 1948.

322

William F. Hopkins, Cincinnati, for defendant.
Carson Hoy, Pros. Atty., Thomas Stueve, Asst. Pros. Atty., Cincinnati, for plaintiff.

## MEMORANDUM OPINION

By STRUBLE, J.:

The defendant stands charged with having had "obscene literature" in his possession and of offering same for sale.

The defendant waived a jury and his case was tried by this Court.

The defendant owns and operates the Bell Block News Shop located in the City of Cincinnati and as charged in the first count of the indictment he did have in his possession as part of his stock-in-trade and offered for sale the January, February, March, April, August, October and November issues of a certain magazine entitled "Sunshine and Health", official organ of the American Sunbathing Association, Inc., which the State says "were not **wholly obscene**, but contained lewd and lascivious photographs and drawings * * * so indecent that it would be improper to place them in the records of this court;" and as charged in the second count of the indictment he did have in his possession and offered for sale "a series of twelve photographs of a female Strip Tease Act and performance" which the State says is so indecent that it would be improper to be placed in the records of this court. The State charges that these photographs, which are of men, women and children in the nude, and this Strip Tease Act are "obscene, lewd and lascivious" and by having in his possession and offering for sale the several issues of this magazine and this "Strip Tease Act" that the defendant violated the "obscene literature" provision of §13035 GC, which is as follows:

"Whoever knowingly sells, lends, gives away, exhibits or offers to sell, lend, give away or exhibit, or publishes or offers to publish or has in his possession or has under his control any obscene, lewd or lascivious book, magazine, pamphlet, paper, writing, advertisement, circular, print, picture, photograph, motion picture film or book, pamphlet, paper, magazine not wholly obscene but containing lewd or lascivious articles, advertisements, photographs, or drawing, representation, figure, image, cast, instrument or article of an indecent or immoral nature * * *."

### DEFENSE.

The parties are in agreement as to the facts but the defendant claims that the "obscene literature" provision of §13035 GC, **supra**, is an invalid exercise of the Police Powers in that it is unreasonable, oppressive, not impartial and has

no substantial relation to public morals and that in the extent of its operations it invades the field reserved for the press by **Article I, Section 11, Ohio Constitution,** which is as follows:

"Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or the press."

and ·that the several issues of this magazine and this Strip· Tease Act are not in fact "obscene, lewd or lascivious".

### SECTION 13035 GC.

Besides "obscene literature", §13035 GC, supra, reenacted in 1943 forbids "drugs" for criminal purposes and "publications" "principally" of police news.

New York has an "obscene literature" statute similar to §13035 GC, supra, and in a recent decision by the Supreme Court of the United States, **Murray Winters, Appellant v The People of the State of New York,** the "police news" provision of the New York statute was held unconstitutional on the ground of uncertainty. Mr. Justice Frankfurter, joined by two other Justices, dissented from the holding of the majority of the Court and said that the decision of the majority invalidates the "obscene literature" statutes in twenty states, one of which is Ohio's §13035 GC, supra. The provisions, parts of §13035, supra, are separable and it seems that this decision has no bearing as to the "obscene literature" part of §13035 GC, supra.

Sec. 13035 GC, supra, is now like it was before reenacted except· that now "whoever knowingly sells" are liable, while before it was "whoever sells" and "magazines, motion picture films" are included in the inhibitions of the "obscene literature" provision, and then by way of amendment the following was incorporated, namely:

"or book pamphlet, paper, magazine not wholly obscene but containing lewd or lascivious articles, advertisements, photographs, or drawing, representation, figures, image, cast, instrument, or article * * *."

### NOT WHOLLY OBSCENE—WHOLLY OBSCENE.

"Not wholly obscene" is "any, some obscenity", less than the whole;—an obscene verse, passage, photograph, any obscene thing in a "'book, paper, pamphlet, or magazine" brings it within the forbidden class by force of this amendment.

"Obscenity" in literature, in the arts, letters and sciences was made a crime in Ohio in 1872 and this statute contained a provision forbidding "any book, pamphlet, periodical, paper or other publication containing any obscene engraving, drawing or picture"; but in the reenactments of this statute in 1876, 1885 and 1894, this "any obscenity" test was omitted but to be re-established for "books, papers, pamphlets and magazines" by the amendment incorporated in the "obscene literature" provision of §13035 GC, supra, as reenacted in 1943.

Other forms of "obscene" literature left by this reenactment not subject to this "any obscenity" test are—"writing, advertisement, circular, print, picture, photograph and motion picture films."

By the statute of 1872 all forms of "obscene" literature inhibited by that statute were forbidden if they contained any of the obscene things mentioned. By the obscene literature provision of §13035 GC, supra, "books, papers, pamphlets and magazines" are forbidden if they contain any of the obscene things mentioned, but not so as to the other forms of obscene literature inhibited by this provision.

Disciplining "books, papers, pamphlets and magazines" more severely for "obscenity" than other forms of literature was never done before in Ohio, nor in any other state or country so far as we are able to discover; although in Massachusetts in Colonial days in 1711 there was enacted a law prescribing this "any obscenity" test for all forms of literature. This statute was continued as a state statute until 1930 when it was repealed in response to public demand.

As to this statute we quote from **Alpert's Article, Judicial Censorship of Obscene Literature, Harvard Law Review, Vol. 52, page 56,** as follows:

"In summary, the Massachusetts law is relatively simple and in its simplicity harsh. The criminal statute originally enacted in 1711 applying to any book' containing obscene, indecent or impure language or manifestly tending to corrupt the morals of youth has been steadfastly construed as banning literary works, save possibly older classics, containing a single passage or passages, the tendency of which is to deprave and corrupt those whose minds are open to such immoral influences and into whose hands the publication might fall."

Obscene literature statutes generally do no more than forbid an "obscene book, etc." and courts through the years have held an "obscene book, etc." to be one containing any or some obscene matter. This "any obscenity" test was not applied alone to "books, papers, pamphlets and magazines"

but to all forms of literature. The "any obscenity" test established by the amendment is only for "books, papers, pamphlets and magazines." In recent years some of the ablest jurists in this country are holding that an obscene book is one wholly obscene and that in testing a literary work for obscenity it must be viewed in its entirety and only when and if the obscene contents constitutes the dominant feature or effect of same does it fall within the forbidden class.

### PURPOSE OF THE AMENDMENT.

The sole purpose of this amendment is to outlaw in this state the "wholly obscene" test for "books, papers, pamphlets and magazines," and shackle publishers, producers and distributors of the same with this "any obscenity" test.

If this amendment is valid the several issues of this magazine fall within the forbidden class if they contain any obscene matter, but if invalid not, so—unless wholly obscene; hence our first inquiry must be as to the validity of this amendment and that requires a consideration of what is obscenity in literature, and of the "any obscenity" test as applied by the courts and of other ways generally applied for testing obscenity in literature.

### OBSCENE LITERATURE—CRIME.

"Obscene" literature was made a crime in England over three hundred years ago and over here in the Colonies some years later, and in due time in the United States and all of the states, and these statutes are all alike except such as provide for the "any obscenity" test, and have always been all alike in that what they do, without mincing words, is to forbid "obscene. lewd or lascivious" books, etc., designating by name what of the arts, letters and sciences are forbidden.

"Obscene"—"obscenity" include "lewd and lascivious" so we will drop the latter two words.

Not any of these laws define "obscenity" or say what it is in literature, or prescribe any test to identify it in literature. That vests the courts with an over-all control, or, as some say, censorship of "obscene" literature; so without ever sending these laws back to legislatures to be made more definite and certain the courts have gone on through the years construing and interpreting the inhibitory words of these statutes generally to agree with their own ideas of what was or was not "obscenity" in the publication before them for review and as time went on the courts have lifted the ban of these statutes from works of art, the sciences and general literature.

### OBSCENITY.

Webster's definition of "obscene" is as follows:

"Ill-looking, filthy, obscene. 1. Offensive to taste; foul; loathsome; disgusting. 2. Offensive to chasity of mind or to modesty; expressing or presenting to the mind or view something that delicacy, purity and decency forbid to be exposed; lewd, indecent; as, obscene language, dances, images. Characterized by or given to obscenity; as, an obscene mind or person. 3. Inauspicious; ill-omened."

and of "obscenity", is as follows:

"1. Quality of being obscene; obsceneness; obscene or impure language or acts. 2. Filthiness; foulness."

There was a time when the courts considered "obscenity" in literature to be all the things Webster says it is; but since then the courts have settled to the view that it was the sex taboo, not that of immodesty, indelicacy and the like, that these "obscène literature" laws place on the arts, letters and sciences.

Having in mind that these "obscene" literature statutes are shackles on the brains of men, which is as bad if not worse than shackles on the limbs of men, the judiciary has been performing a great service for mankind through the years in lifting this sex taboo from the arts, letters and sciences, and in limiting the scope of these statutes to sex in literature, that is, "anything", "something", as courts say, in a literary work that tends to "arouse impure sex ideas in minds susceptible of such ideas." But that is not a definition of "obscenity", only what the courts say is a "test" by which to identify it in literature.

How is this test to be applied? How is a court or jury to know if on reading a literary work sex ideas arise in the minds of the readers and, if so, whether they are pure or impure for according to this test, it is only lustful or impure sex ideas with which courts and juries are concerned.

Pure, normal sex ideas are all right. All of mankind have sex ideas. Nature is aflame with sex ideas,—the hoot of the owl, the coo of the dove, the blossoms of the flowers, plants, and trees, the spawning of the fish. Sex is the why and wherefore of life and living.

The wheat can not be separated from the chaff, by this test; and thinking of it, there came to my mind the old axiom of the law—"where the law is uncertain there is no law."

"Obscenity" is not a legal term. It cannot be defined so that it will mean the same to all people all the time, everywhere. "Obscenity" is very much a figment of the imagina-

tion,—an undefinable something in the minds of some and not in the minds of others; and it is not the same in the minds of the people of every clime and country, nor the same today that it was yesterday or will be tomorrow.

Necessarily, in "obscenity" trials, if that which is claimed "obscenity" in the literary work in review is "obscenity" in the mind of the court or the jury, the defendant is found guilty, and if not, not guilty.

Alpert's Article, Judicial Censorship of Obscene Literature, Harvard Law Review, Vol. 52, at page 70, says of obscenity:

"The law, in its ponderous generalities, still remains as a weapon of censorship with the only safeguard the mercy of a judge. * * *".

and, as to the first one hundred years, of obscene literature as a crime: (p. 47)

"There is no definition of the term. There is no basis of identification. There is no unity in describing what is obscene literature, or in prosecuting it. There is little more than the ability to smell it. * * *."

In 1868 there came an epochal event in the history of the crime of "obscene literature" in the form of a test whereby to identify "obscenity" in literature. Epochal, in that it was the first test to be announced by the courts and in that it has been the test generally applied by the courts of England and this country ever since its announcement. In Regina v Hicklin, L. R. 3 Q. B., 360, Lord Cockburn, speaking for the court said:

"I think the test of obscenity is this, whether the tendency of the matter charged as obscenity is to deprave and corrupt those whose minds are open to such immoral influences, and into whose hands a publication of this sort may fall."

The "matter charged as obscene" was but a part of the literary work under review and counsel argued that the work considered in its entirety was meritorious. Lord Cockburn's answer was:

"Be it so. The question then presents itself in this simple form: May you commit an offense against the law in order that thereby you may effect some ulterior object which

you have in view, which may be an honest and even a laudable one? My answer is, emphatically, no. The law says you shall not publish an·obscene work."

The high spots of Lord Cockburn's test are (a) that the "matter charged as obscene" may be a passage, chapter, picture, any part of the literary work, and (b) the "tendency" of which is to "corrupt" the morally weak.

Lord Cockburn's test is the orthdox test for "obscenity" in literature, but 'in substance it was applied by the Court of England, of the Colonies, and of this country before its pronouncement in the Hicklin case, and since down to the present time, but disregarded by courts as often in the breach as in the observance. It is no different than the Massachusetts statutes of 1711.

### STATE'S CASE.

The State bases the first count of the indictment on the "any obscenity" test of the amendment which is a part of the Lord Cockburn test. Counsel for the State cited the law of the Hicklin case as the law of the pending case and argue that while the State does not claim that the several issues of this magazine are obscene considered in their entirety, nevertheless, says the State, they fall within the forbidden class because of the nude photographs in them the tendency of which is to corrupt the moraly weak.

### LORD COCKBURN—TEST—POLICE POWERS.

The "obscene" literature provision of §13035 GC, supra, without the amendment forbids an obscene "book", etc., and its inhibitions include all forms of literature. It is of itself a complete statute and construing it without the amendment we must consider the "any obscenity" part and the "might harm the few" part of Lord Cockburn's test in relation to police powers which all governments have and may exercise in the interest of health, peace, safety and morals of the people within their domains.

These "obscene" literature statutes are enacted by governments in the exercise of their police powers; and to be valid, enactments in the exercise of police powers must be reasonable, be impartial in their operations, not unduly oppressive and be for the general good; and as these statutes impinge on the freedom of the press, United States and State

Constitutions require that they not do that beyond what is reasonably necessary to effect their objective.

The "obscene literature" provision of §13035 GC, supra, was enacted in the interest of the morals of the people of Ohio.

### LORD COCKBURN'S ANY OBSCENITY TEST.

As to this "any obscenity" it is to be noted that "obscene literature" statutes merely forbid an "obscene book", etc., and leave it to the courts as to what is an "obscene book", etc.

My conclusion is that an "obscene book" must be held to be one "wholly obscene" and that necessarily in testing a literary work for "obscenity" it must be viewed in its entirety and only when and if the "obscene" contents constitute the dominant feature or effect does it fall within the forbidden class. Is obscenity the dominant idea, and aim of a literary work? If so it falls within the forbidden class, otherwise not.

These "obscene literature" statutes do not say that an "obscene book etc." is one that contains any or some obscenity. Courts that say that are writing this "any obscenity" test into these statutes.

The General Assembly of Ohio must have considered an "obscene book" as one "wholly obscene", else why incorporate this amendment in the "obscene literature" provision of §13035 GC, supra, forbidding "books, papers, pamphlets and magazines" if they contain any or some obscenity. This "any obscenity" test disregards merits entirely, for as Lord Cockburn puts it, if a literary work contains some obscene matter, although meritorious on the whole and its purpose "be an honest and even a laudable one", it falls within the forbidden class.

These "obscene literature" statutes to be valid must be reasonable and have a reasonable relation to their objective, namely, the moral good of the people of the State or country enacting them. Considering an "obscene book etc." as one containing anything, something, that might excite impure sex ideas in minds susceptible of such ideas, supposedly youth and the morally weak, strictly enforced would bring within the forbidden class much there is of the arts, letters and sciences, and we doubt if there is a present-day newspaper or other publication that could comply with a test of this sort.

What courts say "obscenity" is in literature may be found in much there is of literature from Shakespeare's works to modern literature.

**From Alpert's Article, supra, at page 71**, we quote:

"Yet all great literature contains the elements we call obscene. Certain portions of the Bible have been termed 'obscene'. When a lady objected to the presence of 'improper' words in Samuel Johnson's Dictionary, he is reported to have said: 'Madam, you must have been looking for them.'"

This "any obscenity" test has been observed so much in the breach by courts through the years that most of the arts, letters and sciences are free of the ban of these statutes, yet courts still generally hold it to be the proper test.

My conclusion is that if that is so then these "obscene literature" statutes constitute an invalid exercise of the police powers and trespass beyond all reason in the field reserved for the press. In holding an "obscene book" as one "wholly obscene" we are supported by the weight of recent decisions.

In **Parmalee, Appellant, v U. S. of America, District Court of District of Columbia,** the court had under consideration for obscenity the book entitled "Nudism in Modern Life", and the Court in speaking of the "any obscenity" test, said:

"But more recently this standard has been repudiated and for it has been substituted the test that a book must be considered as a whole in its effect, not upon any particular class but upon all those who it is likely to reach. * * * The determining question is, in each case, whether a publication, taken as a whole, has a libidinous effect."

In United States v One Book Entitled Ulysses, C. C. A., 2nd District, 72 Fed. Rep., 705, syllabus 2, is as follows:

"Where literary publication is sincere and the erotic matter therein was not introduced to promote lust and does not furnish the dominant note of the publication, it is not 'obscene' within statute prohibiting importation of any 'obscene' book (Tariff Act 1930, Sec. 305 (a), 19 USCA, Sec. 1305 (a))."

and syllabus 3 is as follows:

"In determining whether a book is 'obscene' within statute prohibiting importation of any 'obscene' book, the test is whether the book taken as a whole has a libidinous effect. (Tariff Act 1930, Sec. 305 (a), 19 USCA, Sec. 1305 (a).)"

## LORD COCKBURN—MIGHT HARM THE FEW TEST

Lord Cockburn and courts generally are saying that these "obscene" literature statutes are for the protection of the morally weak; that these statutes withhold from all of us what of literature there is that contains any or some matter that might excite sexually impure ideas in minds susceptible. of such ideas.

The answer to this contention is that the police powers. may not be exercised for the benefit of the few in disregard. of the many, and statutes so enacted are invalid.

In **State of Ohio v Boone, 84 Oh St 351,** the Court in its. opinion, speaking of police power, says at page 351;

"To justify the State in thus interposing its authority in behalf of the public it must appear first that the interest of the public generally, as distinguished from those of a particular class, require such interference; and second that the means. are reasonably necessary for the accomplishment of the pur-- pose and not unduly oppressive upon individuals."

My conclusion is that Ohio's "obscene" literature statute having been enacted for the preservation of the morals. of the people of this state that it necessarily follows that the moral standards, moral concepts of the people of this. state, as to what is obscene literature, is the only test allow- able. It is the moral concept of the people as a whole that. literature is obligated to respect.

The community concept of what is "obscene" literature is approximately ascertainable. It goes without saying that. public opinion, community concepts condemn sexually nasty,. perversive publications, prints, pictures, drawings or photo- graphs as "obscene", not because they might excite sexually impure ideas in minds susceptible of such ideas because that. is a mere matter of conjecture, but because they offend the moral concepts of the people as a whole, and the people have the right to establish codes of right conduct for literature as well as for other forms of community conduct.

A governmental policy that would withhold from all of us what is all right for most of us because it might be bad for some of us (youth) as, for example, ban tobacco, labor, liquor,. etc., would compel us to close up shop.

In U. S., v Harmon, 45 Fed. Rep., 414, from the opinion. at page 417, we quote:

"Laws of this character are made for society in the aggregate, and not in particular. So, while there may be individuals and societies of men and women of peculiar

notions or idiosyncrasies, whose moral sense would neither be depraved nor offended by the publication now under consideration, yet the exceptional sensibility, or want of sensibility, of such cannot be allowed as a standard by which its obscenity or indecency is to be tested. Rather is the test, what is the judgment .of the aggregate sense of the community reached by it?"

In United States v Kennerley, 209 Fed. Rep., 119, at page 120, Justice Learned Hand speaking of the Lord Cockburn test, that is, that it is the interest of the few that controls, says:

"That test has been accepted by the lower Federal courts until it would be no longer proper for me to disregard it."

and then he said:

"I hope it is not improper for me to say that the rule as laid down, however consonant it may be with mid-Victorian morals, does not seem to me to answer to the understanding and morality of the present time, as conveyed by the words, 'obscene, lewd or lascivious', I question whether in the end men will regard that as obscene which is honestly relevant to the adequate expression of innocent ideas, and whether they will not believe that truth and beauty are too precious to society at large to be mutilated and in the interests of those most likely to pervert them to base uses. Indeed, it seems hardly likely that we are even to-day so lukewarm in our interest in letters or serious discussion as to be content to reduce our treatment of sex to the standard of a child's library in the supposed interest of a salacious few, or that shame will for long prevent us from adequate portrayal of some of the most serious and beautiful sides of human nature. * * *."

Mr. Justice Hand says that while the Lord Cockburn test is "consonant" with "mid-Victorian morals", yet it is not agreeable to the "morality of the present time" (1913), and yet he applied the test in the case on trial before him. Why enforce in this country and the states the moral standards of mid-Victorian times? These "obscenity" statutes have no extra-territorial force. They are enacted in the interest of the morals of the people whose government enacted them. The moral standards of peoples are not the same in all the states and countries and change from time to time, yet in

this country due respect for the freedom of the press tends to uniformity in the states as to what is obscene literature.

How fundamentally unsound it is for example in Ohio for courts to enforce the moral concepts of the people of England of what obscenity in literature was in mid-Victorian times under a statute enacted in 1943 by the people of Ohio for the preservation of their own moral concepts of what is "obscene literature."

### POLICE POWERS—AMENDMENT FREEDOM OF THE PRESS.

The question is whether the amendment incorporated in the "obscene" literature provision of §13035 GC, supra, is a valid exercise by the state of its police powers, and does this amendment in its operative effect invade the field reserved for the press beyond what is reasonably necessary to effect its objective?

### POLICE POWERS.

Besides what has been said as to the validity of this "any obscenity" test as applied by the courts throughout the years there are special reasons as to why this amendment is invalid. The "obscene" literature provision considered with the amendment does not treat all forms of literature on equal terms. It is not impartial in its operation in segregating "books, papers, pamphlets and magazines", and disciplining them for "obscenity" more severely than it does other forms of literature, namely, "writing, advertisement, circular, picture, photograph, motion picture film." The "any obscenity" test of this amendment for "books, papers, pamphlets and magazines" is incalculably more severe than the "wholly obscene" test for other forms of literature and brings an anomalous situation into the "obscene" literature statute of this state. An "obscene" photograph, print, or picture "in a book, paper, pamphlet or magazines" brings the latter within the forbidden class but not so in a "writing, advertisement or circular" unless it constitutes the dominant feature of the same. A "writing, advertisement, circular, containing any or some obscenity", but not the dominant feature of same, is not within the forbidden class but in a "book, paper, pamphlet or magazine", brings the same within the forbidden class. There is no reason for treating "books, papers, pamphlets and magazines" more harshly than other forms of literature. They are no more prone to "obscenity" than other forms of literature.

Considering the amendment standing alone it is unduly oppressive in establishing an "obscenity" test for "books, papers, pamphlets and magazines", that would be impossible

at least for newspapers and magazines to observe. How could it be possible for present day publishers of newspapers and magazines to keep their publications entirely free of everything that might "tend to stir up the sex impulses", as some judges say obscenity in literature is, or "tends to excite impure sexual ideas in minds susceptible of such ideas", as other judges say it is, or "tends to deprave and corrupt those whose minds are open to such immoral influences" as Lord Cockburn and other judges are saying it is.

In the case of **Froelich v The City of Cleveland, 99 Oh St, 376,** syllabus 4, we find an accurate statement of the scope and limitations of the police powers, namely:

"The state and municipalities may make all reasonable, necessary and appropriate provisions to promote the health, morals, peace and welfare of the community. But neither the state nor a municipality may make any regulations which are unreasonable. The means adopted must be suitable to the end in view, must be impartial in operation and not unduly oppressive upon individuals, must have a real and substantial relation to their purpose, and must not interfere with private rights beyond the necessities of the situation."

### FREEDOM OF THE PRESS.

"Obscene" literature statutes impinge on the freedom of the press which is one of the fundamental freedoms, rights of the people guaranteed them by Article I, United States Constitution, State Constitutions and **Article I, Section 11, Ohio Constitution,** the pertinent part of which is:

"and no law shall be passed to restrain or abridge the liberty of speech, or the press."

Constitutional freedoms, rights of the people, are not absolute nor are the police powers of the state, hence, the people in the exercise of their freedoms, and the state in the exercise of its police powers, must abide by the rule of reason that the people might enjoy their freedoms to the fullest extent consistent with the public welfare.

Considering the "any obscenity" test established by the amendment for "books, papers, pamphlets and magazines", in its relation to the freedom of the press, the question is: What is its operative effect on the freedom of the press?

Well, as we pointed out before, however meritorious on the whole a publication may be, whatever the subject matter,

however sincere the presentation or the size, form and design of the presentation, if such publication contains some erotic matter that might stir up impure sex ideas in minds susceptible of such ideas this "any obscenity" test brings it within the forbidden class.

Sec. 13037 GC, exempts works of art by bona fide Associations of Artists not organized for profit and medicine but all other "books, papers, pamphlets and magazines" are covered by this amendment. The "any obscenity" test of the amendment is more severe in its operative effect than the "any obscenity" test established by the decision in the Hicklin and other cases for the force of the latter is merely as a precedent which courts may disregard but not so of the "any obscenity" test of the amendment because courts must enforce statutes as they are written.

Having in mind what the courts say is "obscenity" in literature this amendment condemns as "obscene" about all there is of present day books, papers, pamphlets and magazines and brings most of us within its penalties having in mind that "whoever knowingly sells, lends, gives away, exhibits or offers to sell, lend, give away or exhibit, or publishes or offers to publish or has in his possession or has under his control" any of the same are subject to the penalties of the statute.

My conclusion is that this amendment in its operative effect invades the field reserved for the press by **Article 1, Section 11, Ohio Constitution,** beyond what is reasonably necessary to effect its objectives.

### SUMMARY OF CONCLUSIONS.

The main part of the "obscene" literature provision and this amendment are separable. The "obscene" literature provision with the amendment is not impartial in its operation, but the amendment is responsible for that. Standing alone the main part of this provision is impartial in its operation and its inhibition includes all forms of literature. The amendment standing alone, as we have pointed out, is unduly oppressive and impinges beyond reason on the freedom of the press.

Wherefore, for the reasons stated we are holding this amendment invalid and the main part of the "obscene literature provision" valid considering an "obscene book, etc." as one "wholly obscene" and the community concept of what is considered "obscene literature" as the only allowable test for the same—with this qualification, that in holding the main part valid we are not passing on, nor are we asked in this case to pass on what might well be considered a basic

weakness of Ohio's obscene literature statute and of others which is that they do not define obscenity or say what it is in literature and to do so clearly is a legislative and not a judicial function.

## MERITS OF THE CASE.
### MAGAZINES.

The magazine "Sunshine & Health", "an educational, scientific and cultural publication", is one of several nudist publications in this country, size eight by twelve inches, of about thirty-two pages; fifteen to eighteen per cent of the contents of each issue is made up of photographs of nude men, women and children taken of them in nudist camps, some of which give a front view and exhibits the pubes area and genitals.

It must be noted that the State is not making any complaint of the written contents of the several issues of this magazine, which is made up of advertisements, news items on nudism, nudist camps, etc., and editorials and articles of a scientific and cultural nature, all well written, quite interesting and instructive.

There is not anything in the nature of sexuality in the written contents of these magazines. The emphasis of the written contents is health through nudism and, the way they put it, nudism is the best way and the only way to get the most out of the health-giving qualities of fresh air and sunshine.

### PHOTOGRAPHY.

The sole complaint of the State as to these magazines is of the photographs of nude men, women and children, and not particularly of these, other than of those exhibiting the front view of which there are quite a few, most of which are of children, girls and boys and some women, and some few of men, taken of them alone, in pairs, or family or other groups. The State claims that these nude photographs shock the sense of decency and tend to arouse impure sexual ideas in minds susceptible of such ideas, particularly youth, the ignorant and morally weak.

Youth is the over-all concern but it seems that youth is not in serious danger from sex in literature according to the Report of the American Youth Commission's Study of young people in Maryland (1938) which was published under the Title "Youth Tell Their Story", from which we quote the following:

"The chief source of sex 'education' for the youth of all

ages and all religious groups was found to be the youth's contemporaries. * * * Sixty-six per cent of the boys and forty per cent of the girls reported that what they knew about sex was more or less limited to what their friends of their own age had told them.

"After 'contemporaries' and the youth's home, the source that is next in importance is the school from which about 8 per cent of the young people reported they had received most of their sex information. A few, about 4 per cent, reported they owed most to books, while less than 1 per cent asserted that they had acquired most of their information from movies. Exactly the same proportion specified the church as the chief source of their sex information."

These photographs it seems were taken and are being published to promote nudism for they seem to be of persons that are of the best in face and form probably to be found in these nudist camps, for these photographs are of only strong, healthy, good-looking people and seem to be saying to one looking at them, "now you skeptic, now you see what nudism can do for you."

So far as is shown, those photographed are all engaged in innocent activities and there is not any emphasis on sex of any kind. There is not, in any of these photographs, any pandering to the lewd and lascivious for pelf and profit; nor any pose, posture or gesture portraying or suggestive of sexual immoralities, perversions or nastiness.

### NUDITY.

The sole inquiry is,—Is nudity, in this magazine, of itself, per se obscenity? The Court holds that nudity is not per se obscenity; nevertheless, there are times, places and circumstances where nudity on display would be out of place and should be penalized, but not as obscenity, but for being on display out of place.

In Parmalee, Appellant v United States of America, District Court of the United States for the District of Columbia, the Court says:

"It cannot be assumed that nudity is obscene per se and under all circumstances. Even the application of the narrowest rule would not justify such an assumption. And, from the teachings of psychology and sociology, we know that the contrary view is held by social scientists.

Nudity in art has long been recognized as the reverse of obscene. Art galleries and art catalogues contain many nudes, ancient and modern. Even such a conservative source

book as Encyclopedia Brittannica, contains nudes, full front view, male and female, and nude males and females pictured together and in physical contact."

In People v Muller, 96 N. Y., 408, 411, it is said:

"It is evident that mere nudity in painting or sculpture is not obscenity. Some of the great works in painting and sculpture as all know represent nude human forms. It is a false delicacy and mere prudery which would condemn and banish from sight all such objects as obscene, simply on account of their nudity. If the test of obscenity or indecency in a picture or statue is its capability of suggesting impure thoughts, then indeed all such representations might be considered as indecent or obscene. The presence of a woman of the purest character and of the most modest behavior and bearing may suggest to a prurient imagination images of lust, and excite impure desires, and so may a picture or statue not in fact indecent or obscene."

Might not the nude photographs of these magazines bring sex to the minds of some people? Quite likely for some are so susceptible to such ideas that a lady's slipper, or garter, anything will bring such ideas to their minds.

Schroeder, "Obscene Literature and Constitutional Law," p. 275, says:

"When an object, even unrelated to sex, has acquired a sexual association in our minds, its sight will suggest the affiliated idea, and will fail to produce a like sensual thought in the minds of those not obsessed by the same association.

Thus, books on sexual phychology tell us of men who are so 'pure' that they have their modesty shocked by seeing a woman's shoe displayed in a shop window; others have their modesty offended by hearing married people speak of retiring for the night; some have their modesty shocked by seeing in the store windows a dummy wearing a corset; some are shocked by seeing underwear, or hearing it spoken of otherwise than as 'unmentionables'; still others can not bear the mention of 'legs' and even speak of them as 'limbs' of a piano."

Photographs of women in the nude it seems are no more likely to excite unchaste ideas than photographs of them fully appareled or so scantily appareled as to be near nude, of which we see many in pictorial magazines or other publications.

Havelock Ellis, in his book "Psychology of Sex," says:

"Nakedness is always chaster in its effects than partial clothing."

and he quoted the Artist Demaurier as saying:

"That nothing is so chaste as nudity."

Burton in his "Anatomy of Melancholy" says that the "greatest provocations of lust, are from our apparel."

Man is monarch of the animal kingdom and is the only one of them who wears clothes, and one-third of mankind still go naked and authentic observers say that morals are better on islands where the people go naked than in neighboring islands where they wear clothes.

Sumner—Folkways, page 426, says:

"The natives of New Britain are naked but modest and chaste. Nudity, rather checks than · stimulates. The same is observed in ·English New Guiana.·

In primitive times goblinism and magic covered especially the things which later became obscene."

Without doubt these front views violate the community's concept of modesty, but those photographed do not consider nudity immodest. However our inquiry is,—as to whether or not they constitute obscenity in the several issues of this magazine? As to that there are front views in the arts and these are uniformly held not to be obscene, and photography is one form of art.

These front views obscene? Well, they merely show humankind as God made them and does He not command "Be ye fruitful and multiply and replenish the earth.". These front views, as well as the other views, are of God's own children as he made them in ·His own image. There can not be any obscenity in God's own handiwork.

Of "obscenity" this Court feels that it' is pertinent to say what the Apostle Paul said of the word "unclean" in his Epistle to the Romans, Chapter 14, Verse 14:

"I know, and am persuaded by the Lord Jesus, that there is nothing unclean of itself, but to him that esteemeth anything to be unclean, to him it is unclean."

Considered in their entirety the several issues of this magazine may not be reproached for obscenity. These magazines, photographs and all of the contents constitute propaganda for the cause of nudism.

.The opponents of nudism might complain of them on that

ground, but nudism, as a philosophy of life, is not on trial in this case.

The State alleges in the indictment that the several issues of this magazine are not "wholly obscene" nevertheless, says the State the nude photographs bring the same within the forbidden class.

This claim is based on the amendment which incorporates the "any obscenity" test of the Hicklin case, which test we have held invalid; nevertheless we conclude that these nude photographs do not constitute obscenity in these magazines.

### STRIP TEASE ACT.

The strip tease act of burlesque theaters of a woman disrobing is not before this court except as presented by a series of twelve photographs of a young woman disrobing, the first of her fully clothed, the others of her at various stages as she disrobes, the last of which is a side view of her in the nude.

The strip tease act is a theatrical skit in the category of the Sally Rand fan and bubble dances and familiar to patrons of burlesque theaters. Most everybody, even adolescents have either seen or know about it and it is all right or all wrong, depending on how it is put on. The way Sally Rand puts on her dances they are considered artistic and beautiful.

This young woman gives a photographic presentation of a woman disrobing. There is not anything unchaste or shameful in a woman disrobing,—they do disrobe; but even doing that very necessary and proper thing has turned some males of the species into "peeping Toms" in every town and countryside in this country and, looking at this photographic presentation of the same, might excite erotic ideas in the minds of some few males but that would be the same with this few looking at other photographs of this young woman or any other woman. What this few see in these photographs is something in their own minds.

There is not anything distasteful to the eye in this series of photographs. This young woman is neatly appareled and she has a nice face and form, and her poses are graceful and her manner playful. We must not misjudge this photographic presentation of a young woman disrobing by reading into it what this young woman did not intend. She is one of thousands engaged in one way or another in the amusement business, and its big business, a legitimate business of satisfying the wholesome interest and curiosity of people in nature, —its forms and manifestations, and particularly in the "body beautiful" which the ancient Greeks idealized and the great

Plato looked on as the embodiment of the eternal spirit, and artists and most of us consider altogether lovely.

In this photographic presentation of herself disrobing this young woman is plying her profession, her chosen pursuit of happiness is to make the most she can out of her looks and talents. That is the way she makes her living. She presents herself in a clean act, a woman disrobing. Actions mirror the mind. Clean actions a clean mind. Lustful actions a lustful mind. Had she permitted herself to be photographed in a way to shame womankind and been sloven in person and pose the State might be justified in maligning such a series of photographs as obscene, but there is not anything in this series of photographs that shames womankind; but the State says that they tend to corrupt and deprave by exciting impure sex ideas in the minds of those who may look at them.

The State does not complain of pure sex ideas and can not any more than it could about ideas of food. Humankind must have ideas of both to go on living and reproducing its kind. Of course this young woman is by nature inherently attractive to man. That is not something she could lock up in the bureau drawer when she went out to have herself photographed. So what are impure sex ideas? The State does not say! The State leaves that to conjecture! Well, at most when of immoralities or pornography or of subnatural, perversive sex actions, all of which are social evils and offensive to good order and decency. There is not anything remotely suggestive of any of these in this series of photographs, hence, the State's case must fail unless the Court is to hold in accordance with the age old creed that being a woman such an exhibition of body and pose, as shown by these photographs, is in and of itself evil. Courts may not enforce creeds unless incorporated into laws.

Men disrobe. Would twelve photographs of a young man of nice face and figure—"body beautiful" acting out with grace and mirth a man disrobing, the last a side view of him in the nude be considered by any one otherwise than just good, wholesome fun? Man is as attractive to woman as woman is to man. Each have for the other nature's inherent charm.

By what sort of logic may these photographs of a woman disrobing be considered obscene and those of a young man wholesome fun?

This Court goes along with what Mary Beard says in her book "Women as a Force in History", viz.,

"The dogma of woman's complete historical subjection to man must be rated as one of the most fantastic myths ever created by the human kind."

This Court tested this series of photographs for obscenity by the Lord Cockburn "tend to corrupt test" and the "tend to excite impure sex ideas test" and finds against the State. But, as stated before, this court rejects all such tests and holds that the only test allowable by the statute is the moral concept of the people as a whole, community concept of what is obscenity in literature, and tested by the community concept we find this series of photographs not obscene. Any one of these twelve photographs would have gladdened the eye of a G. I. as a pin-up girl.

There would be no doubt different reactions in people looking at this series of photographs, some with the viewpoint of the ancient Greeks would see beauty of face and figure and grace of pose; others would see wholesome fun and still others see obscenity, and "peeping Toms" would have their hunger satisfied without having to go to jail.

The Court concludes that this series of twelve photographs, considered alone and as a group, and the several issues of this magazine "Sunshine & Health" are not obscene and the defendant is therefore found not guilty.