## Commonwealth v. Hueston

*John W. McWilliams*, District Attorney, for Commonwealth.

*B. H. Marks*, for defendant.

RODGERS, P. J., October 11, 1956.—Defendant is charged with the violation of section 524 of The Penal Code of June 24, 1939, P. L. 872, 18 PS §§4524, 4530. Section 524 reads:

"Obscene Literature, etc.—Whoever sells, . . . exhibits . . . or offers to sell . . . any obscene, lewd, lascivious, filthy, indecent or disgusting . . . magazine . . . photograph, figure or image . . . is guilty of a misdemeanor."

The evidence established that defendant sold or exposed for sale three magazines, one containing 8, another 12 and another 60 photographs of nude females in various poses, displaying and perhaps emphasizing their breasts, but not showing their pubic or genital area. Two of the magazines sold for $1 each and the third for $.50. All of the magazines addressed themselves to the problems of figure photography. Defendant waived a jury trial and the question of his guilt or innocence is for this court which must act as both judge and jury.

We have hesitated in filing our judgment in this matter not so much because of any real doubt as to the proper decision under the law, but rather because of our reluctance to appear to give our blessing to the dissemination of such material on public newsstands. There is a natural tendency to consider such a matter on the basis of what is "good" for the public.

This, of course, we have no right to do. There are agencies other than the court which must bear the responsibility for this work. Our responsibility under

the statute is to convict defendant if these pictures are obscene, and to acquit him if they are not.

Is a picture of a nude woman showing her breasts but not her pubic or genital area an obscene picture? Is a magazine containing 8, 12 or 60 such photographs of nude women obscene, lewd, lascivious, filthy, indecent or disgusting?

One might expect that this particular question would have previously been the subject of judicial scrutiny but actually we can find no Pennsylvania case on point. We do, however, have several guideposts in our Pennsylvania law on the question of obscenity generally.

The leading case on this question in Pennsylvania is considered to be Commonwealth v. New, 142 Pa. Superior Ct. 358 (1940), where the court held:

"The test for obscenity most frequently laid down seems to be whether the writing would tend to deprave the morals of those into whose hands the publication might fall by suggesting lewd thoughts and exciting sensual desires. . . .

"The exact point at which language becomes obscene or filthy cannot be determined by any standard test, but it is rather a matter of opinion to be ascertained by the use of ordinary common sense and reason, taking into account the circumstances in which the matter is employed."

This type of language is somehow not too helpful to this court in its present rôle as an arbitrator of the facts as well as the law.

Other cases have been somewhat more specific. The earliest case dealing with pictorial obscenity in Pennsylvania is that of Commonwealth v. Sharpless, 2 S. & R. 91 (1815), in which defendant was convicted of exhibiting a picture showing a man "in an obscene, impudent and indecent posture with a woman".

In Commonwealth v. Gordon, 66 D. & C. 101, at page 104, Judge Bok, in his résumé of his exhaustive opinion on this subject, held that obscenity "has no such inherent meaning; that different meanings given to it at different times are not constant, either historically or legally; and that it (obscenity) is not constitutionally indictable *unless it takes the form of sexual impurity, i.e., 'dirt for dirt's sake'* and can be traced to actual criminal behavior, either actual or demonstrably imminent."

At page 136:

". . . the modern rule is that obscenity is measured by the erotic allurement upon the average modern reader; that the erotic allurement of a book is measured by whether it is sexually impure—i.e., pornographic, 'dirt for dirt's sake', a calculated incitement to sexual desire— . . ."

Judge Bok added that in addition there must be a "reasonable and demonstrable cause to believe that a crime or misdemeanor has been committed or is about to be committed as the perceptible result of the publication".

This definition of obscenity as well as the "clear and present danger" requirement was approved by the Superior Court in Commonwealth v. Feigenbaum, 166 Pa. Superior Ct. 120. The Supreme Court, in effect, approved the definition of obscenity in a per curiam opinion dated March 30, 1950, without, however, "approving the test of clear and present danger as applied to alleged obscene literature" as stated by Judge Bok. See 166 Pa. Superior Ct. 120.

Therefore, we may assume that a photograph or painting to be considered obscene under Pennsylvania law must be, in effect, sexually impure and pornographic, i. e., dirt for dirt's sake. Do our pictures come within that classification?

Again we say that we have been able to find no Pennsylvania case on point. However, the matter has been considered by several Federal courts where they have consistently held that "nudity is not, per se, obscene": Sunshine Book Company v. Summerfield, 128 F. Supp. 564 at 567.

Associate Justice Miller, of the United States Court of Appeals for the District of Columbia, in Parmelee v. United States, 113 F. 2d 729, at page 734, said:

"Nudity in art has long been recognized as the reverse of obscene. Art galleries and art catalogues contain many nudes, ancient and modern. Even such a conservative source book as Encyclopaedia Britannica contains nudes, full front view, male and female, and nude males and females pictured together and in physical contact."

In State v. Lerner, 81 N. E. 2d 282, 293 (Ohio C. P.), the artist DeMaurier is quoted as saying "that nothing is so chaste as nudity".

A New York court in the People v. Gonzales, 107 N. Y. S. 2d 968, 969, said:

". . . nudity per se is not obscene. The reproduction of a Goya nude may titillate, fascinate and stimulate, yet, . . . not violate." See also 128 F. Supp. 564, 567, 570.

In addition, we have the direction of the Superior Court that we are to consider the position of the alleged offending material "in the arts": Commonwealth v. New, 142 Pa. Superior Ct. 358 (1940). This, of course, would be a difficult thing for this writer to appraise, considering his limited knowledge in that field. Nevertheless, the exhibits do, at least in their own words, address themselves to the photographic arts. Commonwealth's exhibit A at page 3 states:

"One of the most challenging fields in creative art today is that of figure photography. Here the camera reaches out towards greater heights of artistic prom-

ise. Portrayal of the vital and radiant perfection of the female nude has challenged the artist throughout the ages."

Commonwealth's exhibit C at page 32 states that the portrayal of the female form has been the highest goal of the artist "from the deeply etched, but eroded primitive expressions on the walls of a cave, through the noble, glowing works of Garaveggio, Titian, Rubens, Goya, Renoir, to this day of the modern man where fleeting glimpses of the female form have been caught indelibly from sensitized silver crystals on acetate".

While this court has grave doubts that any of the exhibits presented for its examination in this case will crowd from the gallery walls any of the works of Rubens, Goya or company, it is, as we indicated previously, hardly within our powers or capabilities to judge the caliber of the artistry. Our duty is to declare whether they are obscene or not obscene.

On June 11, 1956, at page 85 of Time magazine, the editor published under the heading of "Master of the Renaissance" a full color reproduction of Tintoretto's "Minerva Pursuing Venus". On April 23, 1956, the same publication carried Lucas Cranach's "Adam and Eve" at page 87. Both Tintoretto's "Venus" and Cranach's "Adam and Eve" were, as were the women photographed in our exhibits, depicted in the nude, but certainly no one would call their work indecent or, obscene.

Are the exhibits in this case to be condemned because they fail to measure up to the artistic standards of a Renoir, Tintoretto or Cranach? I think not.

The law does not permit us "to reduce our treatment of sex to the standard of a child's library in the supposed interest of a salacious few": United States v. Kennerley, 209 Fed. 119, 121. Under the Pennsylvania and Federal cases we are required to determine

whether these pictures are sexually impure, pornographic or dirt for dirt's sake.

Do these pictures depict sexual impurity? Since the whole of the expression must be given effect, the word impurity cannot be ignored. The Commonwealth must prove that the pictures are not merely sexual but sexually impure. The obscenity or sexual impurity charged by the Commonwealth in this case is the display of the nude female form. It being clear that nudity is not obscene in itself, it follows that to offend the statute, the pictures must display something more than nudeness. There must be nudeness plus some independent aspect of indecency. Examples of this would include a display of the pubic or genital area of the male or female as in the Sunshine Book Company v. Summerfield, 128 F. Supp. 564, or a woman in an indecent position with a man as in Commonwealth v. Sharpless, 2 S. & R. 91 (1815).

In a rather exhaustive analysis of this problem, the Federal judge in the Sunshine Book Company v. Summerfield, 128 F. Supp. 564, at page 569, made a detailed analysis of numerous nudes and found that they were not obscene unless they displayed a part of the male or female genital area.

This rather practical rule of thumb appears to coincide very well with the somewhat more subjectively stated Pennsylvania rule that an obscene thing is that which is sexually impure, pornographic or dirt for dirt's sake.

The pictures in question here do not display any part of the male or female genital area. There is a display of nudity but with no additional aspect of indecency. On this basis we find that the magazines in question are not obscene.

This we do without in any way intending to favor the situation which makes them the common stock of trade on every book and magazine counter in the

county. This court feels strongly that they, and innumerable editions of like nature, add nothing to the welfare of society. However, under our system in which I have the greatest faith, it is not for the court to determine what is good or bad for our people. This situation does, however, we believe, constitute an unmistakable challenge to those groups who have an unofficial but sincere interest in the welfare of our communities, with particular reference to our young people. Many other pulp publications carrying numerous photographs of clothed or partially clothed females which much more closely approach obscenity than so-called straight nudes, are now available at our newsstands to all who can pay the dime or quarter purchase price. These publications can be removed from our shelves when and if organized groups in the community demand that the dealers remove them.

If it appears that this court is declining to meet a problem itself and then suggesting that another group handle the same matter, we make no apology for it. Such is our system of government that the minds of men must be permitted the widest possible range of freedom commensurate with the safety of the citizenry. The courts must be eternally vigilant not only to protect society from the criminal but also to protect society from unconstitutional encroachments on our basic liberties. For this court to impose a judicial censorship beyond its properly mandated constitutional limits would be just as much an invasion of the liberties of the people as the refusal of the right of trial by jury. On the  other hand, under our system, the individual citizen has his freedom of speech to address his remarks to the public and to the individual distributor to bring pressures to bear which can and will, if exercised, severely and properly limit the dissemination of such materials as have been the subject of our consideration here.

Newsstand operators have been heard to say that they are powerless to remove the objectionable material from their stands because their failure to display it would cause the distributors to refuse to allocate them any of the standard popular periodicals which their clientele demands.

If this is´ true, then the interested persons should perhaps make their voices heard with these nationally accepted publications to see that they do not become a part of a tie-in sale with objectionable material.

Many of our leading service and civic organizations have already recognized the law's limitations in this field and have moved to accept their share of the responsibility.

The June issue of the Kiwanis magazine carries a lead editorial on its "Crusade for Better Reading", and reads, in part:

"Kiwanis International has launched as one of its major-emphasis projects for 1956, a Crusade for Better Reading.

"Numerous newsstands scattered throughout the length and breadth of the land stock some of the most pernicious forms of obscene trash that man's mind is able to produce. It does not seem possible that the average citizen can be aware of this and remain unmoved. . . . It might be argued that such publications should be censored and banned. The Canadian Criminal· Code and its counterpart in the United States make it an offense to publish or distribute obscene literature, but relatively few operators are caught in the meshes of the law, and the Code in this respect becomes virtually ineffective . . . If the law fails, how can the tide of vile publications be stemmed?"

The writer, Archie Clifford Lewis, M.A., D. Paed., Dean of Ontario College of Education, University of Toronto, concludes that a great responsibility lies with parents and organizations interested in our youth to

take specific action to protect the more impressionable segments of our public from objectionable reading material. The Pennsylvania State Federation of Women's Clubs has had the fight against marginal literature as one of its specific projects for two successive years. In New York City, the operators of the newsstands themselves have taken specific action. An editorial in the February 29, 1956, issue of the Philadelphia Evening Bulletin under the heading "Obscenity on News Stands" states:

"Self-censorship by licensed operators of news stands in New York City is claimed to be successful by the license Commissioner. Commissioner Bernard J. O'Connell is advised by a committee representing three veterans organizations and New York Association for the Blind, and passes along their recommendations to the dealers many of whom are veterans and blind persons. The result is that 24 objectional magazines are not for sale on the news stands.

"Wisely the Commissioner has declined to identify the publications which are considered 'obscene or indecent'. The news stand operators know what they are and most of them are glad to be rid of such rubbish.

"Respectable publications have a keen interest in this effort to remove indecent print and pictures from the company they keep on the news stands *but banning them by law is not the answer*. The New York progress is more promising, since it admits that the public has the right to buy or not to buy and the merchant has an equal right to sell or not to sell."

Without in any way detracting from the propriety of such programs, it may be suggested that they are perhaps a little too general to secure action at a local level. While we are not advocating the vigilante tactics of Carrie Nation, nevertheless, it would seem that specific, organized action of interested persons making

specific, organized demands on the newsstand opera-
tors themselves would serve as a successful and con-
tinuing deterrent on the circulation of objectionable,
yet legal, publications in the community.

### Verdict

And now, October 11, 1956, we find defendant not
guilty.